IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

RCVD - USDC - CHAS, SC
2025 NOV 17 AM11:18

David Anthony Babb, DAB, LLC

_____

.

_____

*(Write the full name of each plaintiff who is filing
this complaint.  If the names of all the plaintiffs
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names.)*

**-against-**

Mrs. Edwina Mathis Wait

_____

_____

*(Write the full name of each defendant who is
being sued.  If the names of all the defendants
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names.)*

**Complaint for a Civil Case**

Case No. <u>2:25-cv-13417-RMG-MHC</u>
*(to be filled in by the Clerk's Office)*

Jury Trial:    ☒ Yes    ☐ No
              *(check one)*

## I.    The Parties to This Complaint

### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | David Anthony Babb- DAB |
| Street Address | P.O. Box 522 |
| City and County | Charleston, Charleston |
| State and Zip Code | SC, 29402 |
| Telephone Number | 864-329-7099 |

### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title (if known).  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Mrs. Edwina Mathis Wait |
| Job or Title (if known) | SCDNR Agent |
| Street Address | Fort Johnson Rd. |
| City and County | Charleston, Charleston |
| State and Zip Code | SC |
| Telephone Number | 843-371-8643 |

Defendant No. 2

| | |
|---|---|
| Name | N/A |
| Job or Title (if known) | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |

Defendant No. 3

| | |
|---|---|
| Name | N/A |

2

| | |
|---|---|
| Job or Title (if known) | _____ |
| Street Address | _____ |
| City and County | _____ |
| State and Zip Code | _____ |
| Telephone Number | _____ |

Defendant No. 4

| | |
|---|---|
| Name | N/A |
| Job or Title (if known) | _____ |
| Street Address | _____ |
| City and County | _____ |
| State and Zip Code | _____ |
| Telephone Number | _____ |

## II.     Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☒  Federal question          ☐  Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.     If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

28 U.S.C. §§ 1331, 1332(a), 1333, and 1343(a) the U.S. District Court has original

jurisdiction in any civil action for a claim arising under federal law, potentially

admiralty or maritime, and the U.S. Constitution

3

**B.**     **If the Basis for Jurisdiction Is Diversity of Citizenship**

    1.    The Plaintiff(s)

        a.    If the plaintiff is an individual

            The plaintiff, *(name)* N/A_____, is a citizen of the State of *(name)* _____.

        b.    If the plaintiff is a corporation

            The plaintiff, *(name)* N/A_____, is incorporated under the laws of the State of *(name)* _____, and has its principal place of business in the State of *(name)* _____.

        *(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

    2.    The Defendant(s)

        a.    If the defendant is an individual

            The defendant, *(name)* N/A_____, is a citizen of the State of *(name)* _____. *Or* is a citizen of *(foreign nation)* _____.

        b.    If the defendant is a corporation

            The defendant, *(name)* N/A_____, is incorporated under the laws of the State of *(name)* _____, and has its principal place of business in the State of *(name)* _____. *Or* is incorporated under the laws of *(foreign nation)* _____, and has its principal place of business in *(name)* _____.

        *(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

Type text here

3.   The Amount in Controversy

The amount in controversy—the amount the plaintiff claims the defendant
owes or the amount at stake—is more than $75,000, not counting interest
and costs of court, because *(explain)*:

75K/CLAIIM AND ONE MILLION IN PUNITIVE DAMAGES

## III.   Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as
briefly as possible the facts showing that each plaintiff is entitled to the damages or other
relief sought. State how each defendant was involved and what each defendant did that
caused the plaintiff harm or violated the plaintiff's rights, including the dates and places
of that involvement or conduct. If more than one claim is asserted, number each claim
and write a short and plain statement of each claim in a separate paragraph. Attach
additional pages if needed.

SEE ATTACHED CLAIMS ONE THROUGH FIVE     pgs.  20-23

## IV.   Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to
order. Do not make legal arguments. Include any basis for claiming that the wrongs
alleged are continuing at the present time. Include the amounts of any actual damages
claimed for the acts alleged and the basis for these amounts. Include any punitive or
exemplary damages claimed, the amounts, and the reasons you claim you are entitled to
actual or punitive money damages.

THIS CASE REQUEST FOR AN EMERGENCY INJUNCTION HEARING

SEE ATTACHED ON RELIEF     pgs. 23-24

## V.     Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.     For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: Nov. 17 , 2025.

Signature of Plaintiff

Printed Name of Plaintiff     David Anthony Babb, DAB, LLC

### B.     For Attorneys

Date of signing: _____ , 20__ .

Signature of Attorney     _____

Printed Name of Attorney     _____

Bar Number     _____

Name of Law Firm     _____

Address     _____

Telephone Number     _____

E-mail Address     _____

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| David Anthony Babb, and DAB, LLC | ) | |
| Plaintiffs, | ) ) | CASE #: 2:25-cv-13417-RMG-MHC |
| v. | ) ) | |
| Mrs. Edwina Mathis Wait, | ) ) | 42 U.S.C. § 1983 |
| Defendant. | ) ) | |
| _____ | ) | JURY TRIAL DEMAND |

### THIS ACTION REQUESTS AN EMERGENCY HEARING FOR INJUNCTIVE RELIEF

Plaintiff David Anthony Babb and DAB, LLC ("DAB") make the following allegations pursuant to the provisions allowed for in civil rights claims regarding the violations of his constitutional rights; to wit: owning personal property, first amendment rights of expression, the right to use the U.S. navigable rivers in SECTOR SEVEN of the United States Coast Guard ("USCG"), which does not impose time limits for anchoring, for purposes of enjoyment of one's property, and due process violations under the Fifth and Fourteenth Amendment from a breach of the vagueness doctrine are under attack by the unlawful acts of Mrs. Edwina Mathis Wait ("Wait") who performed the act under color of law in declaring DAB's vessels derelict through her subjective opinion while in her official capacity as an officer of the State of SC. Wait is employed as a South Carolina Department of Natural Resources ("SCDNR") agent, and was not performing her official duty but was acting in a retaliatory manner due to DAB's acts of writing to the Department of Interior ("Secretary") requesting for various local law enforcement officers to become arrested for their unlawful acts in conspiring and maneuvering vessels to the owners detriment and for their conspiring roles in theft of public use lands to become part of corporate

expansion; see **Exhibit A** (LETTER TO SECRETARY)**, which shows that one officer wrote his own laws, including § 21-70(g)(1)n, that became Municodes in the municipality of Charleston of which he was the enforcer over federal waters threatening arrest if they did not acquire insurance despite that neither federal nor state regulations require such.**

## NATURE OF CAUSE OF ACTION

1.      This action is, in part, a civil rights suit against the Defendant Wait for violations of DAB's First Amendment Rights of Expression as is explained in C/A 2:23-cv-03218-RMG-MHC Dkt. No. 40 CLAIM SEVEN, which is presently on appeal in the Fourth Circuit Court of Appeals, No. 24-1916.

2.      Next, DAB has a constitutional right to possess personal property as is provided for by the Fifth and Fourteenth Amendments to the U.S. Constitution and the word that Wait relies on violates the vagueness doctrine as outlined in the SC Statute of declaring vessels derelict; to wit: S.C. Code § 50-21-210 defines derelict as one that is wrecked, **junked,** or in disrepair with a visible identifier and left on state waters for at least 21 consecutive days after a notice is posted.

3.      The vessels are within the parameters of U.S. navigable water adjacent to a USCG station, known as the USCG Ashley River base station.[1]  Also, directly to the west of DAB's vessels is a federal channel that has a 300' easement, and to the east is a joint federal and state sanctuary for the protection of bird and fowl wildlife that has a 150' easement into the waters which are federal; thus, DAB's vessels are anchored smack DAB in the middle of the four corners of federal law: U.S. Navigable waters, Federal Channel, Federal base station, and

---

[1]      DAB has received information from a prominent source that the Blackstone Corporation is working with the City of Charleston to purchase the USCG Ashley River base station. DAB filed a motion in 2:23-cv-03218-RMG-MHC to have the City of Charleston made a defendant in that action which is labeled a land grab.

Federal-State Bird and Fowl Wildlife Sanctuary where it is bounded by a SC State road with the City of Charleston's jurisdiction ending at the low tide mark as established by S.C. Code 5-7-140(B), see **Exhibit B** (<u>Topographical view</u>).

    4.    The vessels that were tagged as derelict are:

    a)    *Cirrhosis of the River* which DAB explained in a newspaper article in the local Post and Courier that the vessel is being used as an art installation to make a point about all of the deceit that was being sold through the Gibbes Museum under the former Director Angela Mack and galleries throughout the U. S.   DAB is attempting to have the Federal Trade Commission regulate such electronic aided artwork (paintings and drawings) for consumer awareness and protection as DAB's Law ( Digital Aided Boundary). This will require illustrators who produce their images with electronic-aided assistance to tag their product as such. This was made as an exhibit in C/A 2:23-cv-03218-RMG-MHC at Dkt. No. 40 CLAIM SEVEN; see **Exhibit C** (<u>IMAGE OF GARBAGE, PHOTOCOPY OF POST AND COURIER ARTICLES ON DAB/*CIRRHOSIS OF THE RIVER,* OR GARBAGE, AND MACK</u>).

    b)    *Pagan Wind* was named such due to COVID-19 (SARS-CoV-2).  That vessel is DAB's workshop, as DAB is attempting to become a licensed mechanic to operate a mobile workshop on the rivers, which would be a lawful act.

    5.    The vessels are lawfully registered with the State of SC, and they are legally anchored in the federal waters of the Ashley River.  However, they are in an area of corporate interest for development; see **Exhibit D**  (<u>Various Development Plans</u>).

3

## THE PARTIES

6.     DAB is a citizen of Charleston, SC, residing on his vessel *Suzanne* in the federal waters of the Ashley River.

7.     Defendant Mrs. Edwin Mathis Wait is believed to be a resident of Charleston, and she is employed with the SCDNR.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction for the acts of tagging DAB's vessels as being derelict over federal navigable waters by virtue of 28 U.S.C. §§ 1331, 1332(a), 1333, and 1343(a). The United States District Court has original jurisdiction in any civil action for a claim arising under federal law, including admiralty or maritime claims, and the United States Constitution.

## FACTS

9.     Wait introduced herself to DAB shortly after SHM purchased the City Marina from the Beach Company[2] on or around November 21, 2021.  She arrived at DAB's vessels with Officer Merrill ("Merrill"), SPO Harbor Patrol for the City of Charleston, and an individual with the SC Department of Health and Environmental Control ("DHEC") and/or he was employed with DHEC's subsidiary; to wit: South Carolina Coastal Zone Management Council ("SCCZMC"). Shortly following the encounter, DHEC commenced with written threats holding that it was unlawful for DAB to anchor his vessels using a mooring ball without first obtaining DHEC's consent.  The continued written correspondence consisted of threats of fines; however, DAB suggested for DHEC to commence with issuing citations and that the sole agent's reliance

---

[2]     Exhibit A provides a section of real estate that has not been developed on the Charleston peninsula; the City of Charleston has moved to develop every square inch as opposed to leaving any green space.  SHM sold its shares to Blackstone Corp. for approximately 5.65 Billion dollars in cash transfer in February of 2025. While the Beach Co. had an agreement pursuant to its BAR application for building the new Jasper to leave Tract No. 2 as greenspace, the Beach Co. reneged their verbal and contractual agreement and developed Tract No. 2. as shown in Exhibit C.

on DHEC Reg.-30 was misplaced as that regulation only applied to land owners and not to those anchored in federal waters; thereafter, all written correspondence ceased.[3]

10.     In early May of 2022, Wait is believed to have met with David Isom ("Isom"), the general manager of SHM, Rudy Socha[4] ("Socha"), the CEO and registered agent of Wounded Nature Working Veterans ("S-WNWV"), and her partner SCDNR Agent William Ladue ("Ladue") wherein they discussed their purpose for that meeting of how to get rid of DAB's vessels.  At the end of the meeting, it was agreed that if Isom would disallow DAB to utilize the parking lot of 17 Lockwood Dr., DAB would have to find another marina to come ashore, as it would be too inconvenient for DAB to walk approximately four miles to his truck every day. This is CLAIM TWO in C/A 2:23-cv-03218-RMG-MHC, and all of the facts concerning what followed are in that case, including writing the Ninth Circuit Solicitor Scarlett Wilson and her returned written response suggesting that DAB forward the matter to the South Carolina Law Enforcement Division ("SLED")[5]

---

[3]     Socha was overheard at a bar boasting how they tricked everyone but DAB.

[4]     Rudy Socha runs a 501(c)(3) non-profit organization known as Wounded Nature Working Veterans wherein he was used as a proxy by the City of Charleston in the waterway clean up project. While many vessels were abandoned and did need to be removed, Socha placed on his social medial page that it was unlawful to possess and/or use a mooring ball pursuant to DHEC Reg-30 and he commenced with seizing the personal property of boaters; including transient boaters as they toured the streets of Charleston as tourist.  Socha then began threatening boaters that if they did not relinquish the titles to their vessels that they would face fines and jail time; thus, he had title transfers to him and/or his organization that allowed for him to impound 200 vessels to date.  Many of these vessels were in great shape; nevertheless, he split the salvage profits with the salvage company.  Some vessels Socha would not send to the salvage yard but would find others to take and make use of them; some of these acts are mentioned in 2:23-cv-03218-RMG-MHC at Dkt. No. 12, Exhibit G. Regardless, Wait and other officers stood protector over Socha's vigilante tactics.

[5]     DAB, twenty years prior, in Laurens Co. forwarded documents to SLED which proved law enforcement officers acted unlawfully, however, SLED buried the documents.  As a result, DAB forwarded such to the Solicitor Jerry Peace ("Peace"), who followed the law and forwarded the matter to SLED requesting that they do investigate. The officers all failed the polygraph test and SLED allowed for them to resign as officers from that county as opposed to being arrested; they resigned and merely went to neighboring counties for employment as officers.  Peace was not reelected as rumors spread that he assisted one with a criminal record against law enforcement officers; Socha explained to DAB that SCDNR would not offer payment for DAB's personal property because of DAB's prior criminal record. Years prior to that SLED was involved with Spartanburg City Police Officer David Bagwell, who was supplying college students with marijuana; Babb v. D.E.A., No. 97-1553 (D.S.C. May 13, 1998) 172 F.3d

11.    DAB acquired all of the information regarding the above paragraph ¶10 from Socha and Ms. Monique Hamilton ("Hamilton"), who is the parking lot manager for SHM. Socha further stated in the telephone conversation on or around May 7, 2022, that if Isom went through with it, that was on him-Isom and that it had nothing to do with him-Socha.[6] Until discovery is allowed, it is uncertain what each individual stated, but all did conspire. Ladue and Wait are the key suspects referred to by Socha as the agents.

12.    On May 9, 2023, the City of Charleston Council Board Members ("Board") held a Board meeting wherein they motioned to adopt § 2023-097, a boating permit ordinance ("ordinance").   However, it was introduced to the Public Safety Committee ("PSC") on May 8, 2023, by Merrill, who may have been a member of the PSC.  In any event, the short introduction of the proposed ordinance violated § 2-24 of the Board's municodes as it requires a two-week window before it can be voted on.  And the ordinance that was enacted on May 23, 2023, never received a reading; therefore, it violated § 2-48 of the Board's municipal codes. Additionally,

---

862 (4th Cir. 1999) which later became published at 58 F.Supp.2d 660 (D.S.C 1999). And prior to that DAB had experienced the G.B.I. network when he was in college sculpting nude female models wherein Officer Charles W. King ("King") searched DAB's apartThe ordinance enacted on May 23, 2023, was never readment on an unlawful warrant and seized the sculpting knife that DAB used. DAB was arrested on a cocaine charge based solely on the residue of that knife and a paid informant; however, that evidence proved to be plaster of paris and not cocaine. King, becoming a laughing stock in the Bullock County Sheriff's Department, informed those who humiliated him that the knife would not come back as plaster paris the next time. King resubmitted the same knife to the G.B.I. forensic examiner in Savannah, Ga. who then returned his forensic findings back to King which resulted in a finding supporting that a trace of cocaine was indeed on the knife. The forensic examiner thereafter forwarded written communications of his involvement with King's unlawful acts to the Solicitor; however, this was not discovered until approximately a year later after DAB's counsel had promised DAB that he'd be released the following day should he sign the agreement. Unable to post bond, suffering sleep deprivation and other mental disorders from a year of incarceration, DAB without reading the agreement signed and found his trustworthy counsel not so trustworthy; DAB was not released as promised, but instead served an 80 month sentence despite that the federal sentencing guidelines only required a 40 month sentence.  Thus, DAB, knowledgeable of the police protection system, like doctors protecting other doctors in medical malpractice suits, chose filing a 42 U.S.C. 1983 action instead of following Solicitor Wilson's suggestion to alert SLED.

[6]    Socha placed on his Social media webpage that all of the boaters anchored in the Ashley River were convicted felons and as a result could not enter lease agreements to live ashore. Socha apprised DAB during their May 2022 telephone call that because DAB has a criminal record that SCDNR would not offer him any money for his vessels and that DAB poses a security risk for the USCG and SHM.

without any readings, the ordinance was lawless, as outlined in S.C. Code § 5-7-270, which mandates that any legal authority requires two readings. The last constitutional violation was that no notice was ever published in any recognized public circulation, thereby denying anyone the opportunity to voice an objection. However, despite these violations, the strongest argument presented by DAB before both State and Federal courts is that the Board wrote laws that it was not authorized to do, thus superseding both State and Federal regulations. DAB raised this point at Dkt. No. 74 in C/A 2:23-cv-03218-RMG-MHC. More egregious was that the Board allowed for Merrill to write his own liability insurance laws[7] to enforce; § 21-70(g)(1)n; neither the State of SC nor the federal regulations require any liability insurance, however these officers were threatening people with arrest, impoundment of their vessels, and Socha was threatening arrest unless they signed their vessel's titles over to him.[8] Merrill even threatened College of Charleston

---

[7]    On April 2, 2024, Merrill, Wait, and her partner Ladue stopped DAB to issue DAB 6k in citations for not acquiring Merrill's 300k insurance policy and two citations were for algae. During the stop, as Merrill wrote out the citations DAB questioned Wait as to why she did not place in her BAR reports of the January 9th, 2024, storm that the vessels' rodes had been cut; see **Exhibit E** (ONE OF WAIT'S BAR REPORTS and Photo of Wait). She replied that she did not notice; see **Exhibit F** (A photo of a vessel's rodes from January 9, 2024). Ladue commented that no one could go out in that storm and cut rodes. DAB explained that the cuts were executed in the calm of the storm during pre daylight hours. Thereafter DAB questioned Merrill on whether he wrote any of the provisions in the City's Municodes and Merrill answered in the affirmative, stating that he wrote the insurance law; section 21-70 (g)(1)n. DAB subpoenaed Merrill's Body Cam Video and had the transcript entered into this Court in 2:23-cv-03218.
[8]    DAB has knowledge of two occasions where Socha acquired titles by way of threats. At least one episode, including the photo of the vessel, was made known to this Court in 2:23-cv-03218 at Dkt. No. 59. Socha always had SCDNR agents positioned in close proximity observing as to make his vigilante style threats seem legal. Another episode with a vessel that exceeded 100k, Zbin, Socha carried an attorney to have the vessel willed to Socha; Zbin was drunk everyday and never left his vessel. Zbin arrived with 20k in gold bullion and paid couriers to deliver his food and alcohol to him. Socha explained and convinced Zbin's family that the vessel was worthless and that the cost to repair would exceed its worth. Thereafter Socha had it placed at the SHM boat yard and it was said to have been sold and transferred to Virginia. Socha boasts that he has removed 200 vessels from the SC rivers, however, many were great vessels of which the owners never received due process. Others were threatened with prosecution and according to some individuals Socha merely snatched and grabbed the vessels. All in all, despite the vessels' conditions, Socha received payment from the city for handling each vessel's, and then he split salvage profits with the salvage yard; not a bad 501(c)(3) non-profit. Again, SCDNR agents and local police would remain in close proximity as a guard for Socha; this may have included Wait.

("CofC") students that if they didn't acquire the insurance, he would come and remove them from their classes at CofC.

13.    As this Court is aware, the Honorable Molly H. Cherry ruled to dismiss DAB's case for failing to state a cause of action, Dkt. Nos. 49 and 51; holding that the State of SC had remedies to deal with unconstitutional ordinances; presently on appeal at Appeal No. 24-1916.

14.    On March 10, 2025, the in excess of 30k of citations[9] were dismissed by the Honorable Susan Herdina ruling with prejudice against the City of Charleston after DAB filed his Petition for a Writ of Mandamus to recuse Judge A. Peter Shahid ("Shahid") in case 2025-CP-10-01239 since Shahid introduced the ordinance on May 9, 2023, and that no readings were ever held; see **Exhibit G** (Court Orders in State and federal court regarding 2024-CP-10-04605 or C/A 2:24-cv-05910 ).  Next, following a conference call in March 2025 with Chief Administrative Judge McCoy in the Court of Common Pleas, it was decided that only three motions would be heard: DAB's Motion for Summary Judgment, DAB's Motion to Consolidate 2023-CP-10-05590, 2024-CP-10-04605, and 2024-CP-10-04571. However, before the hearing scheduled for May 21, 2025, the Clerk of Court's Officer/Officers altered the docket sheet which originally only supported the above three motions, yet soon thereafter it became saturated with approximately (18) motions that were already deemed moot due to the March 10, 2025, dismissal order; Exhibit F.  Nevertheless, during the May 21, 2025, hearing before Judge Rode, DAB's Motion For Summary Judgement was not allowed to be heard first; which would have terminated the case. Instead, as time ran out, after over two and a half hours of addressing moot motions and other non-related matters, which took precedence pursuant to Judge Rode's

---

[9]    Wait was present during the first issuance of citations against DAB for his acts of possessing Algae; this was argued in this Court from around Dkt. No. 18-33 in C/A 2:23-cv-03218-RMG-MHC.

decision of court procedure, the legal issues regarding the constitutionality of the ordinance went unaddressed.

15.     Judge Rode did however allow for a hearing to be held at a later date to address DAB's Motion For Summary Judgement to declare the ordinance unconstitutional; however, when that date arrived, counsel for the City of Charleston, Mathew Johnson withdrew the ordinance under a repealed status conditions holding that the Board would correct its unlawful provisions of Merrill's insurance provisions and the 500 yard dome to all marinas on August 19, 2025, and September 9, 2025; see **Exhibit H** (Email from Johnson to prevent Court ruling). DAB arrived at City Hall on the first Board Meeting and voiced his objections; however, they were never deliberated, and their dog and pony show proceeded to a vote without ever having a reading or deliberating DAB's filed and verbal objections.  However, on September 9th, the Board relocated from City Hall to James Island at a retirement center. DAB traveled by CARTA and arrived at the facility just in time, having walked a mile, to voice his objections.  Oddly, the YouTube video of the September 9, 2025, Board Members meeting represents that while the audio worked for everyone else, it was muted when DAB spoke at approximately 14:25 minutes into the segment;[10] see attached as **Exhibit I** (Letter Forwarded to Jennifer Cook and DAB's prior submitted objections to the Board).  Nevertheless, the repealed ordinance removed Merrill's unlawful insurance provisions, § 21-70(g)(1)n, and it removed the 500-yard distance requirement, which mandated that vessels could not anchor near any marina; again, Wait was present as Merrill threatened to impound and incarcerate boaters over Merrill's Laws.[11]

---

[10]     Two people were called to speak before DAB, however neither approached the microphone, so when Jennifer Cook, Clerk of City Hall, announced for DAB to come forward, DAB immediately requested an additional amount of time since the others didn't speak. That portion of DAB being far away from the microphone was picked up.

[11]     The Board never had a single reading of the ordinance; thus, S.C. Code § 5-7-270 mandates that the municodes were lawless.  Therefore, all of the unlawful activity conducted from the officers were nothing more than Merrill's laws as he took part in writing them. One incident involved Merrill

However, the repealed ordinance stipulates that a vessel cannot anchor within 300 yards of any marina, which effectively eliminates all public use space and renders the ordinance unconstitutional. Incidentally, Bill 77 under the 124th Session of SC General Assembly never allowed for municipalities to enact their own laws; it only allowed for an amendment to Title 50 at S.C. Code § 50-21-30(B) and (C) to be allowed to obtain an ordinance to obtain the names of the vessel's owners, if authorized, and that the municipality had to keep their ordinances "IDENTICAL" to State of SC statutes.  DAB's main argument is that the Board violated its authorized powers, and to date, the Court of Common Pleas has not allowed this argument to be heard. DAB has remedies to refile a Summary Judgement and since the Board moved the repealed ordinance back into enforcement without ever having a reading that the matter can go before the Supreme Court of SC; thus, and thereafter, if DAB cannot acquire relief in the State Courts he will then move under the *Younger* Doctrine before this Court for a ruling on the constitutionality of the present repealed ordinance, which is now being actively enforced, and its Municodes, unless this Court agrees that the present unlawful activity being conducted should immediately be addressed. DAB commented to the Board on August 19th that the repealed ordinance is the same pig, it's just dressed in a different outfit. The relevance is that Wait still communicates enforcement of these unlawful municodes; with no readings, they remain without legal force, and therefore the City's jurisdiction ends at the low tide mark as is provided by S.C. Code § 5-7-140(B).

---

telephoning a woman in Michigan to inform her that he was going to arrest her husband because her husband refused to acquire the 300k insurance policy; her son was with her husband as they were traveling south in their sailboat.  In any event, the woman was frantic and while she did not follow Merrill's suggestions to call his friend's insurance company, she did acquire a ludicrous 300k policy; details of this were filed in case 2023-CP-10-05990.

**JULY OF 2021**

16.     Socha informed DAB that SCDNR was moving to condemn the use of the eastern side of the Ashley River for public use. The newly enforced repealed ordinance reduced the 500-yard marina dome to 300 yards; nevertheless, this regulation supersedes both State and federal regulations over anchoring rights of public use space. Additionally, DAB has submitted a petition to the Secretary requesting that the area be designated as a Special Needs Anchorage Area ("SNAA"), as no handicap provisions are currently available in the U.S. riverways.

**SPRING OF 2023**

17.     In the Spring of 2023, the area described in Exhibit B was given to Socha; see Exhibit D, which includes Socha's development plans. The application process submitted to the SCCZMC was flawed due to fraud, as Socha used an address that did not belong to him, and he never consulted with the owners, namely Mike Bennett and Susan Ford. Moreover, 3 Lockwood Dr. was a half mile away from his development site.[12] DHEC Agent Sara Reed never conducted any research; she merely permitted Socha to condemn approximately 12 acres of U.S. navigable waters, and as a result, she is a defendant in 2:23-cv-03218-RMG-MHC.

**JUNE 7, 2023**

18.     On June 7, 2023, Wait and her partner, Officer Ladue, and USCG first-class petty officer Mr. Jason Reiling approached DAB, and Wait explained that the area was going to be dredged and that DAB needed to move his vessels to the opposite side of the Ashley River. DAB was fully aware that the area could not be dredged due to the presence of dioxin in the riverbed. An article published in 1998 disallowed the marina from dredging eastward; thus, the

---

[12]     Imagine a property owner on the Stono River receiving a permit to place a mooring, but instead of it being perpendicular on or adjacent to their property that it gets placed a half mile upstream away from their property; ludicrous. However, SCDNR agency was a participant in this land grab theft; or at least Wait was as her acts in early May of 2022 and on June 7, 2023, support.

reason for the westerly expansion. Wait further stated that the area was being converted into a law enforcement center. The USACE disallowed that law enforcement development, or Wait was miscommunicating.

### JULY 6, 2023

19. On July 6, 2023, instead of following the suggestion of Solicitor Scarlett Wilson, DAB chose to file a 42 U.S.C. § 1983 action against the following defendants: Isom, Socha, Reed, Ladue, and former Mayor John J. Tecklenburg, as noted in Dkt. No. 74 amended Mike Seekings ("Seekings") and Shahid. Upon amendment, Ladue was removed since Socha did not confirm which SCDNR agent was present during the matters addressed in CLAIM TWO of that case; however, DAB suspects that the agents present were both Ladue and Wait, and that Socha perceived them as DHEC agents.

### AUGUST 7, 2023

20. On August 7, 2023, Socha cut the rodes to vessel *TITI IV* owned by Ed Bulger ("Bulger"), and not only did Socha haul *TITI IV* to the other side, but Socha acquired Bulger's dinghy tender from the dinghy dock and carried it with the vessel, preventing Bulger from accessing his vessel. DAB personally witnessed *TITI IV* survive two hurricanes when it was anchored on the eastern side of the Ashley River before Socha vandalized it; *TITI IV* had two 45-pound CQR anchors, which Bulger acquired from another boater when Bulger arrived; they were used in a dual anchoring setup of approximately 55 degrees separation. DAB immediately began taking photos of *TITI IV* after Socha unlawfully moved it because it was clear that Socha negligently anchored *TITI IV* and that such negligence constituted a perilous situation; DAB forwarded the photos that he was taking of *TITI IV* to the federal clerk of court's office because it was common sense that as soon as a strong wind came at high tide that it was undoubtedly going

to cause damage. On August 8, 2023, SCDNR was observed by *TITI IV* with Socha; however, DAB could not identify who was on the SCDNR vessel. Nevertheless, Socha later informed DAB that Ladue had mentioned that he could not simply cut the rope and move it without a court order. Socha further apprised DAB that he had filed a civil action to obtain a court order for the removal of DAB's vessels. Socha's lawsuit was dismissed with prejudice as the Magistrate ruled in DAB's favor; this was clear that Socha's involvement with condemning 12 acres of U.S. navigable waters was pretext to a larger development project; see Exhibit D. Clearly SCDNR agency or certain officers within the organization are working for corporate expansion against the public's rights of usage of public use areas as provided by the public trust doctrine.

21.     Socha later admitted to the above vigilante tactics in federal court at Dkt. No. 37 and 48; see **Exhibit J** (SOCHA'S ADMITTANCE TO ACTS OF PIRACY). DAB's Dkt. No. 12, Exhibit G mentions many of Socha's vigilante acts. Seekings even commented on Socha's vigilante acts; however, Seekings stated that the police have his back; Dkt. No. 12 ¶30. DAB filed his reconsideration motion and motioned that Socha's admission letters be received into evidence, as they proved that he was a State Actor and that Isom was a State intermediary, but as Dkt. No. 80 provides that DAB's Motion To Stipulate such evidence was never addressed and is an issue on appeal; 24-1916.

### AUGUST 8, 2023

22.     On or around August 8, 2023, SCDNR Agents, Socha, and Isom were televised at SHM in celebration of acquiring the 12 acre area for Socha's development; interesting is that after DAB forwarded his request for arrest for certain officers to the Secretary, Socha's social media page no longer shows the live televised group of SCDNR Agents all cheering the placement of OCRM04513. Previously, the S-WNWV website had several postings of different

news stations that aired live news segments; perhaps Wait was in the crowd. Too, after filing for criminal charges with Solicitor Wilson, DAB eventually forwarded a request to SLED, however, as suspected they declined to prosecute; thus, the river clean-up project may have given Socha the right to commit acts of piracy from the head of the State of SC and law enforcement agencies have been instructed to disregard due process rights to property owners and any unlawful acts committed in the process.

23.     A former Post and Courier article supports how former City Marina Manager Robbie Freeman wanted to convert public use space into corporate mooring fields; see Exhibit D. Recently one corporate mooring has been installed inside the boundary of the USCG Anchorage No. 1. Also, the Beach Company recently applied to DHEC for a permit to build a private boardwalk out into the area adjacent to Tract No. 2; see Exhibit D. The Post and Courier ran an article on that; see **Exhibit K (Post and Courier Article in protest of development of U.S. Navigable water area).** DAB argues in federal court that Socha's ability to attempt to condemn the eastern side of the Ashley River was a smokescreen for corporate development. DAB submitted an objection to DHEC regarding the boardwalk development, arguing that it would allow him to bring his appeal back for a ruling, as the evidence was not available when the action was amended. Since Wait attempted to get DAB to move his vessels for dredging, it raises a concern about whether she is working for the Beach Company's interest.

## JANUARY 9, 2024- STORM

24.     On January 9, 2024, a known storm passed through Charleston, bringing heavy rain and winds that were predicted three days before reaching 80 mph; the airport recorded the winds at 77 mph. DAB argues in federal court in C/A 2:23-cv-03218-RMG-MHC that someone went into the USCG Federal Anchorage No. 1 and, in a particular area, an area that is adjacent to

14

where the M5 Superyacht was docked, took a knife and cut over 60 percent of the rodes to approximately six vessels.[13]  During the storm, the vessels broke free and allided with stationary vessels at the Harborage Ashley River Marina.  Witnesses stated that the boats approached quickly with no anchor in tow, and that they worked from off the decks of the stationary vessels to prevent the moving vessels from colliding with them.  However, at least three boats were reported in Wait's Bar report as having caused damage; to wit: *TITI IV* and *EMMA* as a direct result of Socha's unlawful and negligent acts, and the vessel owned by Russel Morgan Bronski ("Bronski").

Bronski communicated that he showed Wait that his rode and other vessels' rodes had been sliced; however, her incident report shows a rode that doesn't support Bronski's findings. He maintains that the cut portion was turned down out of view of her camera and that he pointed out that all of the other vessels' rodes had been cut.  Wait refused to put that into her BAR report. Viewing the available photos in Exhibit F should have warranted law enforcement to review early morning security photos; unless they were instructed to stand down.  The C.I.A. asked the D.E.A. to stand down when Oliver North's campaign was smuggling tons of cocaine into the U.S.; so law enforcement is known to commit bad acts, especially when getting some form of payment.  Those C.I.A. planes used in those government drug smuggling operations ended up here in Charleston for hire to fly individuals to the Bahamas with a marketing scheme that stated that passengers' luggage would not be checked. SC even hired the federal government to smuggle drugs into South Carolina; Google Operation Jackpot, the drugs arrived and were not destroyed, but did go to King St. for sales to the CofC students. These are regular occurrences since the war policy in this country is that the U.S. government is mandated to saturate its own

---

[13]     DAB does not have a copy of the complete BAR report and does not have first hand information; the number of vessels involved is from others who communicated to DAB who were present and others who had first hand communication with Wait.

streets with controlled substances, with the rationale that such activity will control and prevent other governments from profiting from the same; this policy was enacted in the Reagan Administration.

DAB wrote to the USACE to see if anyone from the City of Charleston or SHM had filed for a permit to acquire a Navigable cul-de-sac in that area, but no response was ever received. By removing the vessels, some agree that it at least made for better drone shots of the M5 when it arrived. Clearly, DAB chose to put debris on his boat, which is pending in 24-1916 and found at CLAIM SEVEN, Dkt. No. 40 in C/A 2:23-cv-03218-RMG-MHC.

It is Interesting that shortly after this episode, on February 5, 2024, Bronski had a brand new rode cut from where he relocated his vessel; apparently, he moved his boat to James Island, and his brand new rode, purchased days prior from West Marine, was cut, and his boat became lodged onto a neighboring dock. SCDNR Agent Chase took a report on this; Bronski was forced to attach to a mooring ball in that area, which proved a poor decision on his part as it broke, resulting in his vessel running aground on Sullivan's Island; it's unclear to DAB if this was the same vessel as the one that allided at the Harborage Ashley River Marina. The point is that security cameras generally operate on a 30-day cycle, and the time from January 9th to February 5th would have allowed law enforcement to review the early morning hours of January 9th had they genuinely been interested in doing so. When the SCDNR agent made the James Island report, Bronski explained that the same vandalism had occurred just several weeks prior at the Harborage Ashley River Marina. Also, another boater claimed in the same vicinity that his rode was sliced completely, as that of Bronski's incident on the fifth of February.

25.     Wait and other officers, including Merrill, would go to people's homes and harass them, informing them that if they did not acquire Merrill's 300K insurance policy, they would be

cited and face possible incarceration, and that their vessels would be impounded. Merrill even left a message on a college student's phone informing her that he would come to the CofC and remove her from her class; she went and purchased the policy through the contact that Merrill suggested, his friend's insurance company.

26.    *TITI IV* received a BAR report from Wait. His vessel had no hold due to Socha's acts, and had Socha not vandalized his boat, it would never have arrived at the Ashley River Marina. One could easily view the photographs of the vessel locations pre-storm, and it is clear that *TITI IV* took out *EMMA*; these two vessels were reported as having caused 200k in damages to the boat *Third Child* and *Prestigious*.

27.    *EMMA* arrived along the eastern bank of the Ashley River past the Harborage Ashley River Marina without anchors; however, it did not suffer vandalism as the other vessels did. *EMMA* was Socha-lized[14] by the malicious act of Socha. Because Socha did not properly anchor Bulger's vessel, it was crystal clear that as soon as high tide came during a storm, *TITI IV* would take off. On January 9, 2024, those conditions were met with full strength. The storm's ebb flow of the incoming tide and reported 77 mph wind provided a velocity that, when *TITI IV* ran across *EMMA*'s rode, the weight of the vessel quickly depressed the chain rode to *EMMA*, causing the cleats to snap out of the fiberglass bow section. *EMMA* arrived lodged on the bank with two gaping holes in its bow section. Fortunately, *EMMA* had insurance, and the insurance company filed a motion for exoneration in this Court in case 2:24-cv-00775-DCN. After all was

---

[14]    Transient boaters would arrive in the USCG Ashley River Anchorage No. 1 and would visit and tour Charleston, only to return to their vessels to discover that their personal property mooring balls had been stolen. When they questioned the neighboring boaters, the majority would apprise them that they had been Sochalized. The term given to the vigilante. See Exhibit G in Dkt. No. 12, ¶30/33 regarding Seekings comments. The City had conspired with these unlawful acts through acts of taking of personal property.

said and done, relying again on Wait's viewing opinion, over $ 300,000 was paid out by other insurance companies, despite the fact that vandalism was involved.

28.     While DAB photographed *TITI IV* after Socha vandalized and unlawfully moved it into the perilous position, another vessel that was abandoned further out the Ashley River in the ICW along the western side was towed at law enforcement instructions, perhaps even SCDNR, to be placed into the shallow waters of the west of side of the USCG Ashley River Anchorage No. 1.  Their overall goal was to try and sink the vessel by allowing its rudder to bang up and down on the rocks that exist over there at that location.  The first storm, however, left it lying on its side on the embankment; thereafter, *Sea Tow* was instructed by law enforcement, again, perhaps with the involvement of SCDNR, to pull it back into the shallow water area above the rocks so that it would sink.  Merrill communicated this with an individual whom he felt that he had a camaraderie with explaining that they were doing it to get S.367 passed; however, that individual relayed Merrill's comments to DAB and DAB wrote to every Senator in SC informing them that: Two vessels had been moved out of St. John marina and place on the embankments across from Riverland Terrace residents, and the above mentioned vessel was placed on the western side so that viewers crossing the overpass could easily see it. Again, it was abandoned in the ICW for over a year without sinking in a safe area, and law enforcement did not follow procedure by putting it on Socha's/S-WNWV OCRM04513 mooring; see **Exhibit L** (Sunken vessel by acts of law enforcement to get S.367 passed).

Recently, there was a televised news segment on local channel five news, Gray TV., https://share.google/2ly6OzWtVkHswhV9x that interviewed Isom, where Isom stated that these boaters come and leave their vessels, and then the cost is up to the taxpayers; more costly since law enforcement purposely caused it to sink.  And recently law enforcement caused for Daryl

Davis's vessel *Giant Turd* to move to the USCG Ashley River Anchorage No. 1 threatening impoundment and fines since it was within 300 yards of SHM; see **Exhibit M** (Photos of vessel location, image of Davis rowing ashore as he is used as an example before the Secretary of why the eastern side should have handicap usage for SNAA, and photo of vessel towing *Giant Turd*). The law enforcement involved in this incident may include the participation of the SCDNR.

29.     Shortly after law enforcement got Davis to move, a vessel was strategically placed in the neighboring area where Davis had been anchored; see **Exhibit N** (Photos and DAB's email to others).  No one is that unintelligent to anchor his/her vessel atop an oyster bed. This vessel was placed here as corporate giants seek to develop federal waters into paid mooring slots. They have likely chosen a well-presented vessel to demonstrate that paid moorings are necessary, or for some other purpose, as they did with the boat mentioned above in ¶28.

30.     Because DAB refuses to move his vessels and because DAB wrote to the proper authorities for an investigation to be held, including possible arrest: to wit: Ninth Circuit Solicitor Scarlett Wilson, SLED Director, and to the Department of Interior, and that DAB provided copies of these letters to the Chief of Police that Wait was acknowledged of DAB's acts and that she moved in a retaliation against DAB's constitutional rights for himself and his property.

31.     *Pagan Wind* has a shop inside with approximately 2k in parts, five generators purchased from Champion Honda which are valued in excess of 5k, and tools that exceed 2k. *Cirrhosis of the River* has DAB's scuba gear valued at $1,500, four Mercury 4hp  outboard motors that were purchased new from West Marine, which have a value exceeding $5k, and numerous tools and parts that exceed $1k; thus, over $20k in personal property is inside these two vessels.  Next, beneath the water, each vessel has four anchors, one inch thick G-3  quality

chains, and rodes, which all exceed 10k. The value of the boats is minimal compared to the personal property effects within. Next, without the boats, it would bring great hardship to DAB and his plans for using the vessels; one for a on the water mechanical shop and the other for supplies whenever DAB gets to shut down legal ordeal and get to painting marsh scenes in open plein aire.

## CLAIMS

### CLAIM ONE

32.     Plaintiff repeats the allegations in the foregoing paragraphs as if fully set forth herein.

33.     Wait, while acting under color of law as a state actor, tagged two of DAB's vessels on November 4, 2025, with large red plastic square flags identifying the vessels as derelict; see **Exhibit O** (Photocopies of the tags and email correspondence regarding DNR25OFF002472 Derelict vessels). Wait further stated in a telephone conversation that commenced on November 5, 2025, at approximately 10:16 a.m., that the vessels meet the junked standard as outlined in S.C. Code 50-21-210 and are therefore derelict. Wait's acts violate DAB's constitutional rights pursuant to the **vagueness doctrine** as established in the Fifth and Fourteenth Amendments.

### CLAIM TWO

34.     Plaintiff repeats the allegations in the foregoing paragraphs as if fully set forth herein.

35.     Wait misuses the SC State Courts to deprive DAB of his Constitutional rights concerning the use of his personal property for purposes of **retaliation,** because DAB notified the Department of Interior - Secretary,  Exhibit A, of Wait's acts of negligence concerning her BAR reports; regarding the January 9, 2024 storm and/or its aftermath of the boating incidents;

including the participation with other officers in enforcing unlawful self-appointed laws. The resulting allided vessels, approximately six vessels, were lawfully anchored in the USCG Anchorage No. One, directly adjacent to where the M5 Vessel was scheduled to dock along the newly extended mega dock, which is an area that DAB opines that SHM wanted for a navigable cul-de-sac, see C/A 2:23-cv-03218-RMG-MHC. Furthermore, each vessel's rodes had been sliced by more than 60 percent, and Wait failed or purposely chose not to include this pertinent information with the vessel's owners for the involved insurance companies. More importantly, after being informed of the vandalism, the security footage was never examined by law enforcement, which became apparent during DAB's conversation with Wait on April 2, 2024. Because DAB requested criminal charges against Wait's associates, Wait has retaliated against DAB in a negative, willful manner to purposely disengage himself from his personal property by falsifying the vessels as derelict. Her harmful acts are materially adverse to DAB's constitutional rights regarding the use of his personal property, as DAB had acted lawfully in requesting an investigation for the possible arrest of her associates. This violates DAB's First, Fifth, and Fourteenth Amendment Rights.

## **CLAIM THREE**

36.    Plaintiff repeats the allegations in the foregoing paragraphs as if fully set forth herein.

37.    Wait is misusing S.C. Code § 50-21-210 through 240 over federal waters as a tool for her **conspiring role in** acquiring corporate expansion and **theft** of public usage of public land/water area, U.S. navigable, and in direct violation of DAB's rights as are provided for through the privileges and immunities clause as set forth by the Fourteenth Amendment. The Commerce Clause provides the USCG with the authority to regulate their waters and SECTOR

SEVEN to date refuses to enact anchoring time limits; thus, pursuant to the Public Trust Doctrine, DAB's constitutional rights of enjoyment of his personal property usage is through the act of anchoring in federal waters, and therefore Wait's wrongful acts violate DAB's Fifth and Fourteenth Amendment Rights.

## CLAIM FOUR

38.     Plaintiff repeats the allegations in the foregoing paragraphs as if fully set forth herein.

39.     Wait is aware of the federal case C/A 2:23-cv-03218-RMG-MHC and that it is on appeal in the Fourth Circuit Court of Appeals in case no. 24-1916. Despite that the subject matter vessels and their rights of existence are pending before the federal court system, Wait purposely engaged a criminal sanction against DAB as S.C. Code § 50-20-240 causes fines and other civil penalties including incarceration; moreover, it allows for any public citizen to take possession and impound and destroy the vessels with all costs, attorney fees, and any additional fines available. Because the boats are the subject of review by the federal court, Wait's act, in essence, constitutes an act of **spoliation of evidence**, as she seeks to destroy what could easily prove to be navigable vessels. Taking the law out of federal court, where jurisdiction is proper, and into her own hands to cause DAB harm violates DAB's First, Fifth, and Fourteenth Amendment due process rights.

## CLAIM FIVE

40.     Plaintiff repeats the allegations in the foregoing paragraphs as if fully set forth herein.

41.     This   CLAIM   is   identical   to   CLAIM   ONE   in   case   C/A 2:23-cv-03218-RMG-MHC, except it adds Wait as the unidentified agent that Socha mistook as a

DHEC agent; see **Exhibit P,** (CLAIM ONE IN 03218). This Claim FIVE comes before this Court pursuant to the holding in *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060, which holds that the second way of equal protection, where the plaintiff is treated differently and not a member of a provided class, is by way of a class of one. "The Equal Protection Clause gives rise to a cause of action on behalf of a 'class of one' where the plaintiff does not allege membership in a class or group." *Id.* 562.

42.    DAB seeks to enjoin the unlawful acts and practices described herein from Wait and other agents in her administration, and that an Order stay both the lower court proceedings and SCDNR from proceeding with its newly enacted provisions that allows for public citizens to take control of others vessels, and disallow any public citizen from removing DAB's vessels by way of injunctive order that can be posted on the boats until resolved from this Court. Notice is hereby given that, immediately upon service of process, DAB will move before this Court for an Emergency temporary restraining order to take effect immediately.  DAB will further seek to recover actual, compensatory, and punitive damages of $75k on each count, as the jurors deem appropriate, especially since Wait willfully decided to misuse SC Statutes in the continuation of unlawful behavior to prevent the use of federal public areas. DAB seeks $1,000,000 in punitive damages for years of disruption.

## LEAVE TO AMEND

43.    DAB reserves his right to amend this Complaint to add different or additional defendants, including, without limitation, any officer, director, employee, or those who profit from towing and salvage who have knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs individually seeks judgment against Defendant as follows:

a.      For an Order declaring the Defendant's conduct violates the statutes referenced herein;

b.      For an Order finding in favor of Plaintiff;

c.      For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

d.      For prejudgment interest on all amounts awarded;

e.      For an order of restitution and all other forms of equitable monetary relief;

f.      For an order awarding Plaintiff expenses and costs of the suit.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable in this action.

Dated: November 17th, 2025.


David Anthony Babb
P.O. Box 522
Charleston, SC  29402

DAB